UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANN FARREN, as Administratrix of the Estate
of KENNETH FARREN,

                                            Plaintiff,
      v.                                                      **DECISION AND ORDER**
                                                                      06-CV-427S

SHAW ENVIRONMENTAL, INC.,

                                            Defendant.
_____

## I.  INTRODUCTION

In this action, Plaintiff Ann Farren, as the Administratrix of the estate of her late husband Kenneth Farren, seeks damages for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.*, by Kenneth Farren's former employer, Defendant Shaw Environmental, Inc.  Plaintiff alleges that Farren was impermissibly discriminated against on the basis of gender, and that Defendant improperly retaliated against Farren for reporting sexual harassment by a coworker.  Pending before this Court is Defendant's Motion for Summary Judgment.  For the reasons discussed below, this Court finds the matter fully briefed and oral argument unnecessary, and concludes that Defendant's motion should be granted.

## II. BACKGROUND

**A.**    **Factual Background**

In 2003-2004, Farren was a member of Laborers' International of North America

Local 210, and employed by Defendant as a laborer's foreman on a construction site. (Affidavit of Bruce Saldana, Docket No. 75-3, ¶¶ 2-5, 8). As part of his duties, Farren would work with operators, members of International Union of Operating Engineers, Local 17. (Declaration of Richard Prohaska, Docket No. 73-5, ¶¶ 1, 3, 5; Saldana Aff. ¶¶ 3, 5). Bruce Saldana, a union labor steward for the project, "witnessed and was privy to many arguments and confrontations between Mr. Farren and a union operating engineer named Albert Puma" (Saldana Aff. ¶ 4, 6). Those arguments:

> began in 2003 over a dispute about jurisdiction between the operators and the laborers on the site. From that point on the confrontations between Al Puma and Ken Farren seemed to be almost constant and while they often included jurisdictional disputes, they seemed to me to be more about Al Puma wanting to harass Ken Farren and destroy Ken's authority and reputation on the job site.

(Saldana Aff. ¶ 8). Saldana explained that "[a]s laborer foreman, Ken Farren had an obligation to stand up for his union members regarding jurisdictional disputes and Al Puma was angry to have his authority challenged by any man on the job." (Saldana Aff. ¶ 9). The "verbal and psychological abuse" directed at Farren, according to Saldana, "went way beyond the bounds of what any worker in any workplace should have to tolerate." (Saldana Aff. ¶ 11). Saldana "on more than one occasion" heard Puma direct statements at Farren "that were hostile, threatening and sexual in nature" and "were almost always about Ken Farren not being a real man, and that he, Al Puma, was the man and that he'd prove it to Ken by 'f***ing [sic] him.'" (Saldana Aff. ¶¶ 12-13). Saldana averred that other workers informed him that Puma would say things to them "like 'How could you listen to a guy like that. He's not a man. A man don't act like that.'" (Id. ¶ 16).

Saldana asserted that, sometime in late 2003 or early 2004, he informed Mark

2

Page, the field construction manager for Defendant, "that we needed some clarification on jurisdictional rules and that he had an operator, Al Puma, starting serious trouble with my labor foreman, Ken Farren." (Saldana Aff. ¶ 21).  When nothing changed between Puma and Farren, Saldana requested that the matter be referred to Richard Prohaska, Defendant's office construction manager. (Id. ¶ 23).  Saldana met with Prohaska, and told him about the arguments and that "Puma was sexually harassing Ken Farren." (Id ¶¶ 24-25).  According to Saldana's version of events, Prohaska "said something to the effect of 'What? Get the hell out of here.  You can't be serious," and that the situation was one for Farren, Puma and Saldana to work out among themselves. (Id. ¶ 26).

On September 13, 2004, Puma verbally harassed and threatened another laborer, James Thigpen. (Saldana Aff. ¶¶ 31-33; Statement of Kenneth Farren,[1] Docket No. 73-8, at 14).  Farren interceded, and after "very heated words" were exchanged, Puma walked off the job site. (Saldana Aff. ¶ 33; Farren Statement at 14).  The next day, Puma approached Farren in the presence of Saldana and asked why Farren reported him to management. (Saldana Aff. ¶ 34; Farren Statement at 14).  Puma became verbally abusive, stating, "I'm going to fuck you," "I won't rest until I fuck you," and "I'm going to fuck you, and tell everyone I fucked you." (Farren Statement at 14; Saldana Aff. ¶ 34). This altercation was also reported to Prohaska that same day, September 14, 2004. (Saldana Aff. ¶ 35; Farren Statement at 15; Prohaska Decl. ¶¶ 6-8, 10-11).  Prohaska assured Farren and Saldana that he would investigate the matter and "discipline or address Puma."

---

[1] This unsworn, signed statement was prepared by Farren, while proceeding pro se, as part of his discovery obligations.  As Plaintiff argues, because Defendant has submitted this document in support of its summary judgment motion, it has therefore waived any objection to its admissibility. See Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005).

3

(Saldana Aff. ¶ 37; Farren Statement at 15; Prohaska Decl. ¶¶ 6-8).

Prohaska stated that he interviewed Puma as a result of the complaint. (Prohaska Decl. ¶¶ 13-15; Affidavit of Al Puma, Docket No. 75-8, ¶¶ 2-6 (initially submitted in connection with Farren's New York State Division of Human Rights claim)). Puma reported to Prohaska that he told Farren:

> I did not threaten Thigpen and his information was 'bullsh–t' [*sic*]. After [they] discussed the issue further, [Puma] told Farren the next time [he] saw Farren do anything that was not in the Company's guidelines, I was going to f–k him. I stated to him 'No, I'm not going to f–k you, you are going to f–k yourself and I'll be the one to squeal on you. I'll be man enough to tell you to your face that I squealed.'

(Puma Aff. ¶ 8; see Prohaska Aff. ¶ 15). Prohaska had also been advised that an employee of Defendant's client, the Army Corps of Engineers, had heard Puma using foul language. (Prohaska Aff. ¶ 16). He verbally reprimanded Puma and advised him to watch his language and treat others with respect. (Prohaska Aff. ¶ 16-17). Prohaska also advised Puma "that he needed to watch his language around the Army Corps of Engineers." (Prohaska Aff. ¶ 17).

Shortly thereafter, having not heard of the outcome of Prohaska's investigation into the matter, Saldana and Farren went to Peter Coutts, the senior project manager and Prohaska's supervisor, and reported the trouble Farren was having with Puma (Deposition of Peter Coutts, Docket No. 73-8 at 10-11, 22, 33; Saldana Aff. ¶¶ 38-40). Farren reported to Coutts that when the argument began to get heated, Puma "opened the excavator door and came out and stood on the track of the excavator and told [Farren] if he doesn't shut the fuck up he's going to come down there and fuck him in the ass." (Coutts Dep. at 34). Coutts described Farren's demeanor at this time as "loud and boisterous and waiving his

arms around and using a lot of typical vulgarities and at one point laughing." (Coutts Dep. at 34-35, 83). It seemed to Coutts that the issue was "not taken seriously by the people that were bringing me the message to begin with until they said they were going to sue at the end of the conversation." (Coutts Dep. at 83). He nonetheless took the matter seriously and told Saldana and Farren that "he was going to take some action." (Saldana Aff. ¶42; see Coutts Dep. at 35). When interviewed by Coutts, Puma admitted to making the statements alleged, but stated that it was "in no means a threat sexually against Ken Farren and that he thought it was in his terms bullshit that Kenny was thinking that he was sexually harassed." (Coutts Dep. at 39). Although verbal warnings were generally given regarding abusive language on the job site (Coutts Dep. at 64-65), Coutts suspended Puma for a week without pay. (Coutts Dep. at 40; Saldana Aff. ¶ 43).

Neither Prohaska nor Coutts were aware of any further incidents between Puma and Farren, and no complaints regarding the sufficiency of Puma's punishment were raised. (Prohaska Aff. ¶ 18; Coutts Dep. at 41, 69-70, 78). Saldana avers, however, that Puma's vicious harassing and threatening comments to Farren increased when he returned to the job site. (Saldana Aff. ¶ 47). Farren left the job on October 11, 2004 and did not return to work for several days. (Saldana Aff. ¶ 47). When Saldana visited Farren at home, he:

> tried to talk [Farren] into coming back but he was convinced that Puma was not going to stop, and that he would try to rape or molest [Farren] and that no one from Shaw was going to do anything to prevent it. [Saldana] couldn't really argue with him on that because it certainly seemed that Shaw was not interested in doing anything to seriously correct the situation.

(Saldana Aff. ¶¶ 47, 50). Saldana averred that he "told Mark Page, the field construction manager for [Defendant], that Ken Farren left the job because he was sexually harassed by Al Puma," but "no one took any action against Puma." (Saldana Aff. ¶¶ 55-56). On

5

November 3, 2004, Farren was terminated as a part of a reduction in workforce by Defendant. (Coutts Dep. at 50-52). Coutts testified that there no issues with Farren's job performance until the end of September, beginning of October 2004, at which point there "was a lot of absenteeism." (Coutts Dep. at 45).

**B.     Procedural Background**

Farren filed a complaint with the New York State Division of Human Rights in December 2004, charging Defendant with unlawful employment discrimination based on sex (State Division of Human Rights (hereinafter "SDHR") Complaint, Docket No. 73-8 at 2-3). Therein he alleged:

> Starting in or around November 2003 Al Puma began to sexually harass me. He would tell me to get out of here or I'll fuck you; he would grab himself in front of me and say I have a big schwanz and it'll go up in you; I'll bend you over and fuck you. I complained to Bill Locking[, Farren's immediate supervisor,] and Rick P. on numerous occasions. [Defendant] has not taken any corrective action nor has discipline been assessed.

(SDHR Compl. ¶ 2-3). Farren continued:

> In September 2004 Al Puma came up to me and asked why I went to the company to complain. After I answered he put his hand on my shoulder and said I'm going to fuck you and tell everyone I fucked you. I immediately reported the incident to Bill Locking and Rick P. No corrective action was taken. Rick P.'s response was not to work together and I was thrown out of the office.

(SDHR Compl. ¶ 4). Farren further alleged:

> On October 11, 2004 I walked off the job because of what I perceived to be threats on my life made by Al Puma and because the company would not take any corrective action. I had informed both Bill Locking and Rick P.; however they took no action to correct the situation.

(SDHR Compl. ¶ 5).

The SDHR determined in February 2006 that there was no probable cause to

believe that Defendant engaged in unlawful discriminatory employment practices. (SDHR Determination and Order, Docket No. 73-8 at 6-7). The SDHR found that the record before it revealed that Farren "reported offensive sexual remarks made by a crane operator on one occasion, to management. The record indicates management interviewed the crane operator and he was given a verbal warning. There is no evidence of any further sexually harassing remarks." (SDHR Determination and Order, Docket No. 73-8 at 6). Inconsistencies between Farren's own account and that of Saldana were also noted. (Id.). Farren's charge was also filed with the U.S. Equal Employment Opportunity Commission ("EEOC")(SDHR Determination and Order, Docket No. 73-8 at 7). On April 4, 2006, the EEOC adopted the findings of the SDHR. (Complaint, Docket No. 1, at 6).

Farren commenced the instant action himself in June 2006, initially proceeding pro se and in forma pauperis. (Complaint, Docket No. 1; Docket No. 3). In the original Complaint, Farren alleged that between September and November 2004, Defendant improperly discriminated against him on the basis of gender by failing to take corrective action with respect to a male coworker who was sexually harassing him and by retaliating against him for raising the harassment complaint. (Complaint, Docket No. 1, at 2-4). On September 10, 2007, Farren turned over certain discovery materials (Docket No. 17), including a handwritten statement signed by him detailing his allegations. (Docket Nos. 17-3 at 10-12; 73-8 at 13-16). Two weeks later, on September 24, 2007, Defendant filed a Suggestion of Death indicating that Farren had passed away on September 19, 2007. (Docket No. 19).

Plaintiff, represented by counsel, moved for an order substituting her, as administratrix of her husband's estate, as plaintiff in the instant action, (Docket No. 24),

and Defendant cross-moved for denial of that request and dismissal of the complaint in its entirety (Docket No. 28). This Court granted Plaintiff's motion for substitution and an extension of time in which to respond to Defendant's Cross-Motion to Dismiss. (Docket No. 34). After the motion was fully briefed, this Court determined that dismissal based on a failure to prosecute was unwarranted, and denied Defendant's Cross-Motion. (Docket No. 38).

Plaintiff subsequently obtained leave to file an Amended Complaint (Docket No. 49), and alleged therein that Defendant engaged in gender discrimination in violation of Title VII by having "a policy that treated men differently than women in that men were subjected to foul language, verbal harassment, sexual harassment and intimidation to which women were not subjected," and that Farren was subjected "to disparate treatment on the basis of his gender that affected the status, terms, conditions, and privileges of his employment." (first cause of action) (Amended Complaint, Docket No. 50, ¶¶ 46-47). In the second cause of action, Plaintiff alleged that Defendant impermissibly retaliated against Farren for reporting sexual harassment by terminating him under the pretext of workforce reduction. (Amended Complaint ¶¶ 52-59). Plaintiff's third and fourth causes of action similarly allege gender discrimination and retaliation in violation of New York State Human Rights Law, (Amended Complaint ¶¶ 60-73), however, Plaintiff has conceded that her state law claims are barred by SDHR's determination on the merits. (Pl's Mem. of Law in Opp'n, Docket No. 75, at 25; see N.Y. Executive Law § 297 (9)(election of remedies provision); Dimps v. New York State Office of Mental Health, 777 F.Supp.2d 659, 661 (S.D.N.Y. 2011)). This Court

therefore considers Defendant's Motion for Summary Judgment[2] with respect to Plaintiff's remaining federal law discrimination claims.

### III. DISCUSSION

Summary judgment is appropriate, even in a discrimination case, where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), (internal quotation marks omitted), cert denied 540 U.S. 811 (2003); see FED.R.CIV.P. 56 (a), (c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Weinstock 224 F.3d at 41, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reaching a determination, the record is not to be considered "in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.' " Kaytor, 609 F.3d at 545, quoting Reeves v. Sanderson Plumbing

---

[2] In support of its motion for summary judgment, Defendant submitted a supporting Memorandum of Law (Docket No. 73-1), a Statement of Undisputed Facts (Docket No. 73-2), the Declaration of Scott Waguespack (Docket No. 73-3) with Exhibits A-C, the Declaration of Richard Prohaska (Docket No. 73-5) with Exhibit A, Declaration of Margaret A. Clemens, Esq. (Docket No. 73-7) with Exhibits A-H. Plaintiff responded by submitting an opposing Statement of Undisputed Facts (Docket No. 75-1), the Declaration of Shawn W. Carey, Esq. (Docket No. 75-2) with Exhibits A-L, the Declaration of Bruce Saldana (Docket No. 75-3), and the Declaration of Harley Locking (Docket No. 75-4). Defendant also filed a Reply Memorandum of Law (Docket No. 76).

Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Further, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir.2003).  Here, the claims raised by Plaintiff's remaining two causes of action are (1) creation of a hostile work environment "that permitted and excused sexual harassment by men against men;" (2) disparate treatment of men "in that men were subjected to foul language, verbal harassment, sexual harassment and intimidation to which women were not to be subjected;" and (3) retaliation by Defendant for Farren's reporting sexual harassment complaints. (Amended Complaint ¶¶ 44-59).

**A.    Hostile Work Environment**

A plaintiff opposing a motion for summary judgment on a hostile work environment claim must elicit evidence "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003), cert denied 540 U.S. 1016 (2003)(internal quotation marks omitted).  A plaintiff who brings a Title VII claim of a hostile work environment based on sexual harassment must also establish that the conduct complained of occurred "'because of the plaintiff's sex.'" McGullan v. Cedar Graphics, Inc., 609 F.3d 70, 79 n 6 (2d Cir. 2010), quoting Patane v. Clark, 508 F3d 106, 113 (2d Cir. 2007); see Liebovitz v. N.Y. City Transit Auth., 252 F.3d 179, 189 (2d Cir. 2001).  An inference of discrimination based on an individual's sex may be raised by evidence from which a trier of fact could conclude that the harassing conduct

was motivated by sexual desire; the harassing conduct was motivated by general hostility to the presence of a person of a plaintiff's gender in the workplace; or by "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80-81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). With respect to motivation by sexual desire, "the inference of discrimination [is] easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity," thus similar evidence will lead to an inference of discrimination in a same-sex harassment case such as this "if there were credible evidence that the harasser was homosexual." Oncale, 523 U.S. at 80. Further, sex discrimination can also be shown by evidence that the harassment was motivated by a plaintiff's failure to conform with gender stereotypes. See Dawson v. Bumble & Bumble, 398 F.3d 211, 218 (2d Cir. 2005).

Defendant correctly argues that the record is absent of evidence that would support the conclusion that Puma's harassment of Farren was gender-related. Specifically, the record is devoid of any evidence from which to infer that Puma was homosexual or that his vulgar comments were motivated by sexual desire rather than simple malice. The mere fact that the "words used have sexual content or connotations" does not automatically constitute discrimination based upon sex. Oncale, 523 U.S. at 80.

> Although explicit sexual content or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender, this need not necessarily be the case. Most unfortunately, expressions such as 'fuck me,' 'kiss my ass,' and 'suck my dick,' are commonplace in certain circles, and more often than not, when these expressions are used . . . , their use has no connection whatsoever with the sexual acts to which they make reference-even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture. Ordinarily, they are simply expressions of animosity or juvenile provocation, and there

is no basis in this record to conclude that [Puma's] usage was any different. Johnson v. Hondo, Inc., 125 F.3d 408, 412 (7th Cir. 1997)(internal citation omitted); see Oncale, 523 U.S. at 81 (determination of sexual harassment "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target")). Here, Saldana averred that the animosity between Farren and Puma, and the direct impetus for many of the altercations between them, was an ongoing jurisdictional dispute, as well as Puma's adverse reaction to Farren reporting Puma for misconduct. (Saldana Aff. ¶¶ 5-6, 8-9, 21, 33-34; see also Farren Statement at 14-15). Indeed, the first time Saldana reported the problem to a supervisor for Defendant, in late 2003 or early 2004, he specifically highlighted the need for "some clarification on jurisdictional rules." (Saldana Aff. ¶ 21). Further, the accounts of both Farren and Puma, which provide detail for only the events in September 2004, similarly support the conclusion that Puma's harassment of Farren was a direct result of Farren confronting Puma with and reporting Puma for misconduct. (Farren Statement at 14-15; Puma Aff. ¶¶ 7-8). Thus, "there is overwhelming evidence that the hostility toward [Farren] was grounded in workplace dynamics unrelated to [his] sex." Brown v. Henderson, 257 F.3d 246, 256 (2d Cir. 2001).

Further, there is no comparative evidence detailing Puma's interactions with women, and thus no evidence that would support an inference that Puma was either generally hostile toward men or treated men and women differently. Oncale, 523 U.S. at 80-81. Nor is there any support for a conclusion that Puma treated Farren differently because Farren failed to conform to a gender stereotype. See Dawson, 398 F.3d at 218  Indeed, both men were similarly described as "large" and "imposing," (Saldana Aff. ¶ 7 (Puma)) and "a tough guy" who "used vulgarities a lot." (Declaration of Harlen T. Locking, Docket No. 75-4 ¶ 21;

Coutts Dep. at 66-67 (Farren)). Defendant is therefore entitled to summary judgment on Plaintiff's hostile work environment claim.

**B.     Disparate Treatment.**

Plaintiff also alleges that Defendant subjected Farren to disparate treatment[3] on the basis of his gender. (Complaint ¶¶ 44-51). Defendant argues that Plaintiff is barred from presenting this claim because of the failure to exhaust administrative remedies by raising it in Farren's charge before the SDHR and the EEOC. (Def's Mem. of Law, Docket No. 73-1, at 19-20; Def's Reply Mem. of Law, Docket No. 76, at 7-8). As Defendant argues, a plaintiff's failure to first present a claim to the EEOC or a state administrative agency may result in dismissal where the new claim is not reasonably related to the charge before the administrative agency. See Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 25-26 (2d Cir. 1985), cert denied 474 U.S. 851 (1985); Ghadersohi v. Roswell Park Inst., No. 10-CV-143S, 2011 WL 4572539, at 2-3 (W.D.N.Y. 2011). Here, Plaintiff's administrative charge alleges Defendant's failure to intercede on Farren's behalf in the face of sexual harassment by Puma. (SDHR Compl. ¶¶ 3-5). There are no allegations, however, that would alert the reviewing agency to the possibility that Farren was also claiming that Defendant also affirmatively discriminated against him by treating him differently than similarly situated female employees. See Mathirampuzha v. Potter, 548 F.3d 70, 76 (2d Cir. 2008)(allegation in charge could not "reasonably be expected to blossom into an investigation covering allegations of unrelated misconduct" such as retaliation). Plaintiff

---

[3]Although Defendant initially construed Plaintiff's claim as only one for disparate impact (Def's Mem. of Law at 7-10), the language in Plaintiff's complaint and the parties' subsequent arguments make clear that the issue here is one of disparate treatment. See generally Lewis v. City of Chicago, Ill., 130 S.Ct. 2191, 2199-2200, 176 L.Ed.2d 967 (2010) (discussing difference between disparate impact and disparate treatment).

therefore failed to exhaust available administrative remedies with respect to the disparate treatment claim.

In any event, Plaintiff is unable to establish a prima facie case on this ground.

> Courts analyze claims of disparate treatment under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Fitzgerald v. Henderson, 251 F.3d 345, 356 (2d Cir.2001). The plaintiff must first establish a prima facie case by demonstrating that: (1) []he is a member of a protected class; (2) [his] job performance was satisfactory; (3) []he suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817.

Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006). Here, ignoring for the moment the question of adverse employment action, Plaintiff has failed to produce any evidence from which it can be inferred that Farren was treated less favorably that similarly situated female employees in circumstances from which a gender-based motive could be inferred. See Montana v. First Federal Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 106 (2d Cir. 1989). Plaintiff offers no evidence of similarly situated female employees whose complaints resulted in more decisive action than that afforded by Defendant to Farren's complaint. See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). Instead, this claim appears to be based on Saldana's statements that "[t]here's no way [Defendant] would have treated a woman employee that way," i.e. failing to intercede on her behalf, and "*[i]f* Al Puma had said any one of the things I heard him say to Ken Farren to a woman on the job, [Saldana] believe[d] [Defendant] would have fired him on the spot." (Saldana Aff. ¶¶ 61-62 (emphasis added)). These statements amount to nothing more than speculation, and are therefore insufficient to defeat a motion for summary judgment. Jeffreys v. City of New York, 426 F3d 549, 554 (2d Cir. 2005). Saldana also asserts his belief that the only

reason for Puma's suspension was the fact that his outburst was witnessed by Alice Hill, an Army Corps of Engineers employee. (Saldana Aff. ¶¶ 43-44, 46). That a woman may have witnessed Puma's outburst does not change the fact that disciplinary action was taken by Defendant as a result of Puma's verbal assault of Farren. Further, Hill, as a representative of Defendant's client, the Army Corps of Engineers, (Saldana Aff. ¶ 44; Prohaska Decl. ¶ 17), is not similarly situated to Farren, Defendant's employee. See Graham, 230 F.3d at 39 (plaintiff not similarly situated with coworkers who had different supervisor). Plaintiff has therefore failed to show a prima facie case of disparate treatment.

**C.    Retaliation**

Plaintiff alleges that, in addition to its failure to take corrective action with respect to Puma's harassment, Defendant also impermissibly terminated Farren's employment in retaliation for Farren's complaints of sexual harassment. Initially, it is arguable that Plaintiff has also failed to exhaust administrative remedies with respect to this claim, inasmuch as the allegation in his SDHR charge that he walked off the job in October 2004 due to Defendants failure to "take any corrective action" fails to alert the reviewing administrative agencies to a retaliation claim. See Mathirampuzha, 548 F.3d at 76. The exhaustion of administrative remedies is a waivable precondition to bringing a Title VII claim in federal court, however, not a jurisdictional requirement. Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000); see Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). Here, although Defendant specifically objected to Plaintiff's disparate treatment claim on exhaustion grounds, no such argument is raised with respect to the claim of retaliation. This Court therefore deems any such

objection waived. See Francis, 235 F.3d at 768.

Retaliation claims are also subject to the McDonnell Douglas Corp. burden-shifting analysis. 411 U.S. at 802-805; see Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010). Plaintiff must first establish a prima facie case by showing that (1) Farren participated in an activity protected by Title VII; (2) his participation was known to Defendant; (3) Defendant thereafter subjected Farren to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Kaytor, 609 F.3d at 552 (2d Cir. 2010). Internal complaints made in good faith to management about sexual harassment are a protected activity within the policies of Title VII, even if those complaints turn out to be unfounded. See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc. 957 F2d 59, 65 (2d Cir. 1992); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). As such, Farren engaged in a protected activity by reporting Puma's harassing behavior to Saldana, Prohaska, and Coutts, and because the record is undisputed that Puma was in fact hostile toward Farren, the complaints of sexual harassment, although ultimately unfounded under Title VII, appear to have been made in good faith. There is also no dispute that Farren was terminated on November 3, 2004. (Coutts Dep. at 50-52).

What is in dispute is whether this termination can be causally connected to Farren's prior complaints. Defendant asserts that Farren was properly terminated as part of a reduction in workforce action in light of his absenteeism. (Coutts Dep. at 50-52, Def's Mem. of Law at 22). Thus, even assuming Plaintiff established a prima facie case of retaliation,[4]

---

[4] "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. [This C]ourt

Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination, and the burden shifts back to Plaintiff to "point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a 'substantial reason for the adverse employment action'." Kaytor, 609 F.3d at 553, quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). This record is clear that Farren stopped showing up for work on October 11, 2004, approximately one month after his last reported complaint of harassment and one month prior to his official termination. (Saldana Aff. ¶¶ 47-52; Farren Statement at 16; SDHR Compl. ¶ 5). Plaintiff argues Defendant's failure to remedy Puma's sexual harassment constituted a constructive discharge of Farren, and this constructive discharge as well as the formal termination in November 2004, constitute retaliation for Farren's complaints of sexual harassment and his assertion that he would pursue legal remedies against Defendant. (Pl's Mem. of Law in Opp'n at 22).

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151-152 (2d Cir. 2003). If a plaintiff cannot show specific intent on the part of the employer, he or she is required to at least demonstrate that an employers actions were deliberate, not merely negligent or ineffective. Petrosino v. Bell Atlantic, 385 F.3d 210, 232 (2d Cir. 2004), citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000). An objective standard is

---

has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff." U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

applied to a constructive discharge claim, requiring a plaintiff to show that "working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suder, 542 U.S. 129, 147, 124 S.Ct 2342, 159 L.Ed.2d 204 (2004)(noting that, absent extraordinary circumstances, employees are expected to remain on the job while seeking redress). Further, a plaintiff "must establish that the constructive discharge occurred in circumstances giving rise to an inference of discrimination on the basis of [his] membership in [a protected] class." Terry, 336 F.3d at 152 (internal quotation marks omitted).

As concluded above, Plaintiff cannot establish that Farren was the subject of discrimination based on sex by either Puma or Defendant directly. Further, Plaintiff has not proffered sufficient evidence to raise a triable question of material fact whether Farren was constructively discharged in October 2004. Plaintiff's submissions are peppered with conclusory allegations that Puma harassed Farren from November 2003 to October 2004. Noticeably absent, however, is any description of the frequency or severity of these verbal assaults. In the absence of such information, even in general terms, there is no basis for a trier of fact to determine whether a reasonable person in Farren's position would find that resignation was the only option. See Pennsylvania State Police, 542 U.S. at 147; compare Holtz v. Rockerfeller & Co., Inc., 258 F.3d 62, 75 (2d Cir. 2001) (summary judgment on hostile work environment claim denied based in part on plaintiff's testimony of offensive conduct occurring "daily," "constantly," "every time [she would try to hand him a paper]" which went on for months) with Saldana Aff. ¶ 12-13 (heard Puma "on more than one occasion" from November 2003 to November 2004 direct hostile statements to Farren).

The only detailed allegations concern the events of September 13-15, 2004, when

Farren interceded in the dispute with Thigpen, and Puma verbally assaulted him the following day as a result. (Saldana Aff. ¶¶ 31-46; Farren Statement at 14-16). Notably, even if supervisors Page and Prohaska failed to appropriately respond when Saldana reported his concerns about Farren and Puma in early 2004, (Saldana Aff. ¶¶ 21-26), the record is clear that Coutts and Prohaska investigated this incident and Puma was removed from the job site for a week. (Saldana Aff. ¶¶ 37, 42-43; Prohaska Decl. ¶¶ 11-16; Coutts Dep. at 35, 39-40). Although Saldana asserts that Puma's harassment of Farren escalated upon his return to the job site, there is no evidence that this was reported to supervisors before Farren stopped reporting to work, and there were no complaints made that the disciplinary action taken against Puma was insufficient. (Prohaska Dep. at 94; Coutts Dep. at 41, 78; see Saldana Aff. ¶ 55 (Saldana reported to Page that Farren had "left the job" because of harassment, but he did not aver that he reported the increased conduct prior to Farren leaving)). There is therefore little evidence that Defendant's actions following Puma's disciplinary action amounted to negligence, and certainly no evidence that Defendant's actions or inactions "were deliberate, not merely negligent or ineffective" as required to establish a claim of constructive discharge. Petrosino, 385 F.3d at 229-230. Plaintiff therefore failed to raise a material question of fact whether the reason for Farren's termination, his absenteeism, was pretext, and Defendant is also entitled to summary judgment on the retaliation claim.

## IV.  CONCLUSION

Plaintiff, having conceded that the state law claims must be dismissed, has failed to raise a material question of fact with respect to the remaining Title VII claims of hostile work environment, disparate treatment, and retaliation. Defendant's motion for summary

judgment is granted in its entirety.

## V.  ORDERS

IT HEREBY IS ORDERED that Defendant's Motion for Summary Judgment (Docket No. 73) is GRANTED;

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.


Dated:   February 10, 2012
         Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
Chief Judge
United States District Judge
